

# Fourth Court of Appeals
## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-15-00786-CR

Johnny Lee **SIZEMORE**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 198th Judicial District Court, Bandera County, Texas
Trial Court No. CR-15-0000049
Honorable M. Rex Emerson, Judge Presiding

Opinion by:    Karen Angelini, Justice

Sitting:    Karen Angelini, Justice
    Marialyn Barnard, Justice
    Rebeca C. Martinez, Justice

Delivered and Filed:  November 16, 2016

AFFIRMED

A jury convicted Johnny Lee Sizemore of aggravated assault with a deadly weapon. At trial, the undisputed evidence showed that Sizemore shot the victim. The only issue was whether Sizemore did so in self-defense. On appeal, Sizemore argues the trial court erred by excluding parts of his testimony about past instances of violence by the victim. We conclude any error was harmless and affirm the trial court's judgment.

**BACKGROUND**

On January 10, 2015, the victim, Shawn Weber, went to Sizemore's house to talk to Sizemore's girlfriend, Mindy Heilbrun. Weber dropped off a propane tank with Heilbrun who had agreed to obtain some propane for Weber. In addition, Weber had a matter to discuss with Heilbrun. Weber and Heilbrun had been neighbors in the past. Heilbrun's children had been removed from her by child protective services and Weber wanted to assure Heilbrun that he was not the one who had reported her to the authorities.

Heilbrun invited Weber to come inside Sizemore's house. Weber, Heilbrun, and Sizemore then went to the bedroom, where they talked and smoked methamphetamine. Sizemore was sitting on the bed and was looking at his laptop computer. Heilbrun and Weber were sitting in chairs. According to Weber's trial testimony, Heilbrun handed Weber her pocketknife, which he examined and returned to Heilbrun. Sizemore also handed Weber a knife which Weber examined and then set down on the chair next to him. At some point, Sizemore handed Weber his laptop to show him something on the computer. Weber gave the computer back to Sizemore. Sizemore then told Weber that he was going to shoot him. Sizemore pulled a gun out from under the bed covers and shot Weber. The bullet skimmed Weber's upper left arm and entered and exited his neck. Weber asked Sizemore why he shot him, and Sizemore said, "Because you are a snitch." The shooting did not seem to surprise Heilbrun, who hovered over Weber for a minute while looking at her phone. Weber was stunned, but he was able to walk out of Sizemore's house. Weber walked to a couple of houses looking for help. Weber was feeling weak and his neck was hurting badly so he stopped walking and came to rest at a house. An occupant of the house called an ambulance.

Weber further testified that he never made a move toward Sizemore or used Heilbrun and Sizemore's knives in a threatening manner.

Sizemore presented a different account of the incident. According to Sizemore's trial testimony, Weber came to his house on the day of the shooting because it was winter, it was cold, and Weber needed propane. Heilbrun was going to get some propane for Weber. Sizemore did not know Weber well, but they had met on two or three occasions. Sizemore denied that he smoked methamphetamine with Weber and Heilbrun. While Weber and Heilbrun talked, Sizemore was on his computer. Sizemore was mad because when he typed his name into the computer, the search results showed that he was connected with a capital murder case. Weber told Sizemore to type his name into the computer. Sizemore did as Weber asked, and the search results indicated that Weber had committed an offense and that he was a pedophile. When Weber learned this, he seemed embarrassed and Sizemore laughed at him. At this point, Weber, who still had Heilbrun's pocketknife, flipped the knife open and started to get up from the chair and come at Sizemore. Sizemore then grabbed his gun and shot Weber. Weber was stunned and fell back into the chair.

Sizemore testified that he was afraid for his life, that shooting Weber was reasonably necessary, and that Weber was too close to stop any other way. Sizemore also testified that if he had not shot Weber when he did, Weber would have probably killed him.

Sizemore further testified that he had an opinion about Weber's reputation in the community: Weber was a violent person. He further stated that Weber's overall reputation in the community was that he was "pretty violent." Sizemore said he was aware of previous incidents of violence involving Weber. One incident involved "an assault with a deadly weapon, a vehicle." Another incident involved a "normal assault." However, the trial court did not allow Sizemore to testify any further about these incidents because Sizemore had no personal knowledge of the details of the incidents.

Sizemore estimated that when Weber lunged at him with the pocketknife he was about eight feet away. Sizemore claimed his gun was not under the covers; it was out in the open.

Sizemore explained that the gun, which was loaded, was next to him because he was "probably" going to show it to Weber after he showed him his knife. Sizemore said that after the shooting he was afraid because he thought he might have killed Weber accidentally. Sizemore also testified that he did not think the wound was that bad; he thought the bullet had just grazed Weber. After the shooting, Weber walked out of the house. Sizemore did not call for medical assistance.

The defense also called Heilbrun to testify. Heilbrun testified that she had agreed to obtain propane for Weber and to talk to him, but she did not want to talk to Weber alone. Thus, Heilbrun had arranged for Weber to come to Sizemore's house while Sizemore was present. Heilbrun admitted she and Weber had smoked methamphetamine, but claimed Sizemore did not. At the beginning of the meeting, Heilbrun and Weber were talking about the report that had been made to child protective services about Heilbrun. Weber wanted Heilbrun to know that he was not the person who had reported her to child protective services. Sizemore was not talking much. Sizemore did mention, however, that when you searched his name on the computer, a criminal case popped up in which he had not been involved. Weber told Sizemore to conduct a search with his name. Weber gave Sizemore his full name and told him where to search on the computer. Sizemore followed Weber's instructions and then said, "Whoa, man, this says you're a pedophile." This made Weber really mad and he starting calling Sizemore a liar. At this point, Weber, who still had Heilbrun's pocketknife in his hand, started to attack Sizemore. Weber flipped the pocketknife open and lunged toward Sizemore who was seated on the bed. Hielbrun feared that Weber would stab Sizemore. Heilbrun heard Sizemore fire a gun at Weber. She then got up out of her chair and walked out of the room towards the other end of the house. Heilbrun was "freaked out," but she did not seek medical attention for Weber.

The defense finally called Ryan Brown. Brown testified that Weber had a reputation in the community for being a very violent person. Brown said he had witnessed a road rage incident

involving Weber. According to Brown, he was a passenger and Weber was driving. As Weber drove, another car came at Weber's car almost causing a head-on collision. Weber swerved out of the way, then motioned for the driver of the other car to come back. The driver of the other car came back and pursued Weber and Brown onto the highway. At one point, Weber got out of the car and the driver of the other car attempted to run over Weber. Weber got back in the car and chased the other car for about five miles. At some point, the driver of the other car slammed on his brakes and Weber went around him. Weber's car and the other car collided multiple times. Weber's car also hit an embankment. Eventually, Weber rammed his car into the other car repeatedly. Brown said he was very "shook up" by the incident.

After hearing all the evidence, the jury rejected the theory that Sizemore acted in self-defense and found him guilty of assault with a deadly weapon. Sizemore appealed.

## DISCUSSION

In his sole issue, Sizemore argues the trial court abused its discretion in excluding his testimony about the details of two past instances of violent conduct by Weber.

Under the Texas Penal Code, "[a] person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." TEX. PENAL CODE ANN. § 9.31(a) (West 2011). The Texas Court of Criminal Appeals has held that evidence of an assault victim's character for violence may be admitted to show the defendant's perception of danger was reasonable based on the victim's violent character. *Mozon v. State*, 991 S.W.2d 841, 845 (Tex. Crim. App. 1999). In *Ex parte Miller*, 330 S.W.3d 610 (Tex. Crim. App. 2009), the court explained that when a defendant is charged with an assaultive offense:

> [T]he defendant may offer reputation or opinion testimony or evidence of specific prior acts of violence by the victim to show the "reasonableness of defendant's claim of apprehension of danger" from the victim. This is called "communicated

character" because the defendant is aware of the victim's violent tendencies and perceives a danger posed by the victim, regardless of whether the danger is real or not. This theory does not invoke Rule 404(a)(2) because Rule 404 bars character evidence only when offered to prove conduct in conformity, *i.e.*, that the victim acted in conformity with his violent character. Here, the defendant is not trying to prove that the victim actually is violent; rather, he is proving his own self-defensive state of mind and the reasonableness of that state of mind.

*Id*. at 618-19 (internal citations omitted).

In the present case, Sizemore attempted to present, through his own testimony, specific instances of past violent conduct by Weber. In a hearing outside the jury's presence, Sizemore testified that he was aware of two such instances. First, Sizemore was aware of an act of road rage which Sizemore characterized as "an assault with a deadly weapon, a vehicle." Sizemore said he did not see the road rage incident take place, but he did see the wrecked cars immediately after the incident. Second, Sizemore testified that Weber had been in a fight with another person in which Weber "tr[ied] to tear the guy's eyeballs out of his head." Other people had to intervene to stop Weber from killing the other person. Sizemore did not see the fight, but he had heard about it from other people. The trial court ruled that Sizemore could testify about Weber's reputation in the community and that he could testify "generically" about his knowledge of the two incidents. However, the trial court ruled that Sizemore could not go into specific details of the incidents because he had no personal knowledge of these details.

On appeal, Sizemore argues the trial court abused its discretion in refusing to allow him to testify about the "details" of the incidents because he was trying to prove his own self-defensive state of mind and the reasonableness of that state of mind. Sizemore further argues that the error was harmful and requires the reversal of his conviction.

We will assume, without deciding, the trial court abused its discretion in excluding the testimony in question. To warrant reversal of a conviction, however, an error in excluding evidence must have had a substantial and injurious effect or influence in determining the jury's verdict.

*Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000); TEX. R. APP. P. 44.2(b) (providing that nonconstitutional error that does not affect substantial rights must be disregarded). Error does not affect a substantial right if it does not influence the jury or has only a slight effect. *De La O v. State*, 127 S.W.3d 799, 804 (Tex. App.—San Antonio 2003, pet. ref'd). In evaluating the likelihood that the jury's decision was adversely affected by the error, we consider everything in the record, including the testimony presented, the nature of the evidence supporting the verdict, and the character of the alleged error and how it might be considered in connection with other evidence in the case. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). We may also consider the State's theory, any defensive theories, and closing arguments, if they are material to our analysis. *Morales*, 32 S.W.3d at 867.

We now examine the record to determine whether the exclusion of Sizemore's testimony about the details of the two incidents had a substantial and injurious effect or influence on the jury's verdict. We first note that the excluded testimony was limited in nature. In the hearing outside the jury's presence, Sizemore testified that he had seen the cars in the road rage incident after they were wrecked and that he had heard that Weber was involved in a fight with another person, that Weber "tr[ied] to tear the guy's eyeballs out of his head," and that other people had to intervene to stop Weber from killing the other person.

Even though Sizemore was not allowed to testify about the details of the road rage incident in front of the jury, another defense witness was permitted to present this evidence. Brown, who was a passenger in Weber's car during the incident, testified in great detail about the road rage incident and Weber's involvement in it. As to the second incident, which Sizemore characterized as a "normal" assault, no other evidence was presented about the details of this incident.

The trial court allowed Sizemore to present other evidence of his self-defensive state of mind at the time of the shooting. Sizemore testified that in his opinion Weber had a reputation for

violence and that Weber's overall reputation in the community was "pretty violent." Sizemore was also allowed to testify that he was aware that Weber had committed "an assault with a deadly weapon, a vehicle" and had been involved in a "normal assault." In light of all of the testimony presented, it appears that the jury had ample evidence before it to evaluate the reasonableness of Sizemore's belief that he needed to shoot Weber to defend himself.

Additionally, during closing arguments, defense counsel argued that Sizemore acted in self-defense, that Sizemore had no choice but to shoot Weber, and that Sizemore acted reasonably under the circumstances. Defense counsel also argued self-defense was the only logical explanation for Sizemore shooting Weber once rather than multiple times. Defense counsel did not focus on Weber's reputation or the incidents of past violent conduct in his closing argument. In fact, defense counsel made only a single reference to Weber's reputation in the community for being a violent person. Defense counsel did not mention the road rage incident or any of the evidence admitted about it; nor did he mention the "normal assault."

In conducting our harm analysis, we may also consider the nature of the evidence supporting the verdict. The evidence showed that three people were present when Sizemore shot Weber. All three of these people testified at trial. The jury was able to assess the credibility of each of these witnesses and evaluate their accounts of the shooting. Obviously, the jury believed Weber's account of the shooting and did not believe Sizemore and Heilbrun's accounts. The jury also viewed photographs of Weber's bullet wounds and the room where the shooting took place. Thus, the jury was able to consider Weber, Sizemore, and Heilbrun's testimony in relation to the physical evidence. In fact, during closing arguments, the prosecutor emphasized the physical evidence, especially the entrance and exit wounds caused by the bullet and the trajectory of the bullet as it traveled through Weber's body. The prosecutor pointed out that Sizemore and Heilbrun's accounts—in which Weber had supposedly lunged at Sizemore with a knife—made no

sense in light of the photographs showing that the bullet had entered Weber's body at the base of his chin and "went straight out" of his body.

We conclude the exclusion of Sizemore's limited testimony about the road rage incident had no effect on the jury's verdict, especially in light of the other evidence presented about the incident. Furthermore, we conclude the exclusion of Sizemore's limited testimony about the details of the "normal assault" had little or no effect on the jury's verdict. After viewing the record as a whole, we conclude that the exclusion of the testimony in question did not have a substantial and injurious effect or influence on the jury's verdict. *See Morales*, 32 S.W.3d at 867; TEX. R. APP. P. 44.2(b). We hold that any error in excluding the evidence was harmless.

## CONCLUSION

The trial court's judgment is affirmed.

Karen Angelini, Justice

Do not publish